UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PATRICK KNOX | * | CIVIL ACTION NO. 2:16-CV-13350 |
| | * | c/w 18-06015 |
| | * | |
| VERSUS | * | HONORABLE JUDGE ASHE |
| | * | |
| | * | MAGISTRATE JUDGE NORTH |
| BISSO MARINE LOGISTICS, | * | |
| LLC, ET AL. | * | *Applies to 16-13350* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **DAWN SERVICES, LLC'S THIRD-PARTY DEMANDS**

NOW INTO COURT through undersigned counsel comes Dawn Services, LLC ("Dawn") and, pursuant to Rule 14(c) of the Federal Rules of Civil Procedure, asserts the following Third-Party Demands against Certain Primary Protection and Indemnity Primary P&I Underwriters Subscribing Severally to Policy No. UMR: B0507 M13PP06940 ("Primary P&I Underwriters") and Certain Underwriters at Lloyd's, London Subscribing to Excess Protection & Indemnity Policy No. UMR: B0507 M13PL03120 (Cover Note Number TMU-405906) ("Coastal Excess Insurer"), and in support thereof states as follows:

### **PARTIES**

1.

Third-Party Plaintiff Dawn Services, LLC is a Louisiana limited liability company domiciled at 851 MacArthur Ave., Harvey, Louisiana 70058.

2.

Primary P&I Underwriters is a foreign insurance company registered to do business, or not registered but doing business, in the State of Louisiana and which can be served through the Louisiana Secretary of State.

3.

Coastal Excess Insurer is a foreign insurance company registered to do business, or not registered but doing business, in the State of Louisiana and which can be served through the Louisiana Secretary of State.

**JURISDICTION AND VENUE**

4.

This Court has jurisdiction over this matter pursuant to its admiralty and maritime jurisdiction, 28 U.S.C. § 1333, because this is a dispute involving maritime contracts, and pursuant to its supplemental jurisdiction, 28 U.S.C. § 1367, because this Court has subject-matter jurisdiction over the main demand and these Third-Party Demands arise out of the same transaction or occurrence as the claims set forth in the main demand.

5.

Venue is proper in this Court pursuant to Rule 9(h) of the Federal Rules of Civil Procedure because the parties are subject to the personal jurisdiction of the Court.

**FACTUAL ALLEGATIONS**

6.

Primary P&I Underwriters issued Policy Number UMR: B0507 M13PP05900 (Cover Note Number TRM-405456) (the "Primary P&I Policy") that named Dawn as an Assured and provided coverage for the policy period beginning October 30, 2013 and ending April 30, 2015. A true and correct copy of the Primary P&I Policy is attached hereto as Exhibit 1.

7.

Coastal Excess Insurer issued Policy Number UMR: B0507 M13PL03120 (Cover Note Number TMU-405906) (the "Coastal Excess Policy") that named Coastal Towing, LLC

("Coastal") as an Assured and provided coverage for the policy period beginning June 13, 2014 and ending June 13, 2015. A true and correct copy of the Coastal Excess Policy is attached hereto as Exhibit 2.

8.

Certain Primary Protection & Indemnity Primary P&I Underwriters Subscribing to Policy Number UMR: B0507 M14PP04870 (Cover Note Number TRM-405905) issued a policy of insurance to Coastal Towing, LLC for the policy period beginning June 13, 2014 and ending June 13, 2015. The policy is referred to herein as the "Coastal Primary Policy."

9.

By an Endorsement with an effective date of June 13, 2014, Dawn was added as an Additional Insured under the Coastal Primary Policy. A true and correct copy of the June 13, 2014 Endorsement is attached hereto as Exhibit 3.

10.

As an Additional Insured under the Coastal Primary Policy, Dawn is an "Insured" as that term is defined and used in the Coastal Excess Policy.

**The Underlying Dispute**

11.

On information and belief, on or about July 18 or 19, 2014, Bisso Marine, LLC ("Bisso") was performing pipe-laying work on and from the L/B MIGHTY CHIEF.

12.

On information and belief, REC Marine Logistics, LLC ("REC") provided a supply boat to Bisso to assist with the pipe-laying work. The supply boat is named the M/V MISS JANE.

3

13.

Bisso and Dawn are allegedly parties to a Master Subcontractor's Agreement ("MSA") that has an effective date of January 21, 2004 and pursuant to which Bisso, as a prime contractor, and Dawn, as a subcontractor, agreed to certain conditions that would apply in the event that Dawn provided services as a subcontractor to Bisso. A true and correct copy of the MSA is attached hereto as Exhibit 4.

14.

As to the work being performed by Bisso on or about July 18 or 19, 2014, Bisso originally requested that Dawn provide a tugboat.

15.

Dawn did not have a tugboat available to fulfill Bisso's request.

16.

Dawn therefore entered into an agreement with Coastal pursuant to which Coastal would provide Bisso the requested tugboat.

17.

The agreement between Dawn and Coastal included a requirement that Coastal would indemnify Dawn for any claims arising out of or related to the agreement, including any claims by Coastal's employees against Dawn and/or Bisso.

18.

The agreement between Dawn and Coastal further included a requirement that Coastal maintain certain insurance coverage, and that Coastal include Dawn and Bisso as Additional Insureds on Coastal's insurance policies, including Coastal's Primary P&I and Excess policies.

19.

Pursuant to the agreement between Coastal and Dawn, Coastal provided a tugboat named the M/V TRENT JOSEPH to assist with Bisso's pipe-laying operations.

20.

On information and belief, on July 18 or 19, 2014, Patrick Knox was working aboard the M/V TRENT JOSEPH as an employee of Coastal.

21.

On information and belief, Knox became ill while working aboard the M/V TRENT JOSEPH, and he therefore needed to be transported back to shore.

22.

On information and belief, Knox was transferred by personnel basket from the M/V TRENT JOSEPH to the L/B MIGHTY CHIEF where he was evaluated by a medic.

23.

On information and belief, the decision was then made to transport Knox to shore aboard the supply boat M/V MISS JANE.

24.

On information and belief, Knox was transferred from the deck of the L/B MIGHTY CHIEF to the M/V MISS JANE by personnel basket.

25.

On information and belief, while being transferred in the personnel basket from the L/B MIGHTY CHIEF to the M/V MISS JANE, Knox was allegedly injured.

26.

Knox has filed suit against, among others, Bisso, REC, and Coastal to recover his alleged damages that he alleges resulted from being ejected from the personnel basket on July 18 or 19, 2014.

27.

As more fully set forth in Dawn's Answer to REC's January 13, 2017 Third-Party Demand, Answer to REC's March 16, 2018 Third-Party Demand, and Answer to Bisso's Amended and Supplemental Complaint, Dawn denies all claims for liability and specifically denies that any indemnification or other amount is owed to REC and/or Bisso.

**Indemnification Provisions and Insurance Requirements**

28.

The MSA allegedly between Bisso and Dawn contains the following pertinent indemnification provision:

> Subcontractor shall release, indemnify and hold Contractor Group (as defined below), harmless from and against all claims, suits or demands (whether or not there be any basis in law or in fact for same) brought against any member(s) of Contractor Group, or in which any member(s) of Contractor Group are named as parties defendant for bodily injury, illness, disease, death or for loss of services of an employee of Subcontractor Group, or for loss or damage to Subcontractor Group's property, arising out of or in any way connected with the performance of services hereunder, or the ingress, egress, loading, or unloading of cargo or personnel, or any presence on any premises (whether land, building, vehicle, platform, aircraft, vessel or otherwise) owned, operated, chartered, leased, used, controlled or hired by Contractor Group or its other subcontractors or Subcontractor or its subcontractors, regardless of whether or not any such claim, suit, or demand shall arise in whole or in part from the sole or concurrent negligence, fault or omission of any member(s) of Contractor Group, its other subcontractors, or strict liability (including any pre-existing defect) or unseaworthiness of any vessel. Subcontractor shall defend any and all such claims and suits at its sole expense and shall bear all other

6

>costs and expenses related thereto, but may investigate, negotiate and settle any such claim or suit as it deems expedient.

(*See* Exhibit 4, MSA, ¶ 4(b) (emphasis omitted)).

29.

The MSA further provides as follows:

>all marine policies of Subcontractor, including but not limited to hull, P&I, and charterer's liability policies, shall be endorsed to provide full coverage to Contractor Group as additional insured without limiting coverage to liability "as owner of the vessel" and to delete any "as owner" clause or any other language purporting to limit coverage to liability of an insured "as owner of the vessel," and to delete any language limiting coverage for Contractor Group in the event of the applicability of the Limitation of Liability Statute.

(*See id.*, ¶ 5(d)).

30.

The term "Subcontractor" under the MSA is defined as Dawn Services, LLC. (*See id.* at 1).

31.

The term "Contractor" under the MSA is defined as Bisso Marine Company, Inc. (*See id.*).

32.

The term "Contractor Group" under the MSA is defined to include:

>individually and collectively Contractor and its subsidiary, affiliated companies, co-venturers, partners, joint venturers, owners, stockholders, representatives, and Customer (and anyone to whom Customer contractually requires indemnity or insurance) as well as the officers, directors, employees, agents, assigns, invitees, and insurers of all of the foregoing; and the term "Contractor" is meant to include only the Bisso Marine Company, Inc.

(*See id.*, ¶ 4(d)(1)).

7

33.

Separately, on December 10, 2014, Dawn and Coastal executed a Master Time Charter Agreement. A true and correct copy of the Master Time Charter Agreement is attached hereto as Exhibit 5.

34.

The Master Time Charter Agreement defined "Charterer" as Dawn and defined "Owner" as Coastal. (*See* Exhibit 5, Master Time Charter Agreement, at 1).

35.

The Master Time Charter Agreement defined "Charterer Group" as:

> individually or collectively, Charterer, its parent, subsidiary, and affiliated entities, and its and their owners, partners, joint venturers, customers, and other contractors and subcontractors (with the exception of Owner and its subcontractors), and the officers, directors, employees, vessels, assigns, representatives, insurers, and subrogees of all of the foregoing. No member of Charterer Group will be considered a member of Owner Group.

(*See id.*, Article 8(A)(2)).

36.

Pursuant to the Master Time Charter Agreement, Coastal was required, inter alia, "at its sole cost to procure and maintain in effect throughout the term of th[e] Agreement, with [a] reputable insurance compan[y], . . . Excess Protection and Indemnity Insurance, or its equivalent, in the sum of not less than $10,000,000 per occurrence." (*See id.*, Article 6(A)(3)).

37.

The Master Time Charter Agreement further provided that the Excess Protection and Indemnity Insurance coverage "shall name Charterer Group as additional assured, with a waiver of subrogation rights" and that "such naming and waiving shall apply only with respect to the indemnity obligations and risks assumed by Owner in th[e] Agreement." (*See id.*, Article 6(B)).

38.

The Master Time Charter Agreement defined "Charterer Group" as follows:

> individually or collectively, Charterer, its parent, subsidiary, and affiliated entities, and its and their owners, partners, joint venturers, customers, and other contractors and subcontractors (with the exception of Owner and its subcontractors), and the officers, directors, employees, vessels, assigns, representatives, insurers, and subrogees of all of the foregoing. No member of Charterer Group will be considered a member of Owner Group.

(*See id.*, Article 8(A)).

39.

The Master Time Charter Agreement included the following indemnification provision:

> Owner releases and will defend and indemnify each member of Charterer Group from and against all claims for personal injury, illness, disease or death, or for damage or loss of property (including the Vessel) of any member of Owner Group that arise out of or relate to the performance or subject matter of this Agreement, or to the ingress, egress, loading or unloading of property, cargo or personnel, and for pollution emanating from the vessel, whether caused in whole or part by the negligence of fault of Charterer Group, or by any equipment or any vessel owned or operated by Charterer Group.

(*See id.*, Article 8(B)).

40.

Bisso has made demand against Dawn for defense and indemnification in response to the action brought by Knox.

41.

REC has made demand against Dawn for defense and indemnification in response to the action brought by Knox.

42.

Dawn tendered a demand to Primary P&I Underwriters and to Coastal Excess Insurer for defense and indemnification in response to the demands made by Bisso and REC.

43.

Dawn has incurred and continues to incur expenses and costs from defending against actions brought by Bisso and REC.

**The Primary P&I Policy**

44.

Dawn is entitled to defense and, to the extent indemnification is owed to Bisso and/or REC (which is denied), indemnification from Primary P&I Underwriters in response to the actions brought by Bisso and REC.

45.

Dawn is an Assured under the Primary P&I Policy. (*See* Exhibit 1, Primary P&I Policy, at 3).

46.

The Primary P&I Policy provides coverage for a vessel named the "Break of Dawn" and for other vessels named in a Schedule attached to the Primary P&I Policy. (*See id.* at 3).

47.

The Primary P&I Policy further provides that the vessels covered by the Primary P&I Policy "includ[e] new and/or added and/or acquired and/or chartered and/or managed vessels automatically held covered at premium to be agreed by Slip Leader." (*See id.*).

48.

The M/V TRENT JOSEPH is a covered vessel under the Primary P&I Policy because the M/V TRENT JOSEPH is a "new and/or added and/or acquired and/or chartered . . . vessel[]" pursuant to the Primary P&I Policy. (*See id.*).

49.

Regardless, the Primary P&I Policy contains the following Contractual Cover Clause:

> Subject always to the exclusions of the Protection and Indemnity Clauses (1.9.97) PDP S.C., this insurance is to cover liability of an Assured in connection with the operation of an insured vessel arising solely by reasons of the terms of a customary contract, written or oral (other than a contract of towage by the insured vessel) for . . . death or personal injury.

(*See id.* at 34).

50.

The Primary P&I Underwriters owe Dawn defense and indemnification under the Primary P&I Policy's Contractual Cover Clause.

**The Coastal Excess Policy**

51.

Dawn is entitled to defense and, to the extent indemnification is owed to REC and/or Bisso (which is denied), indemnification from Coastal Excess Insurer in response to the actions brought by REC and Bisso.

52.

The Coastal Excess Policy is excess to the Coastal Primary Policy.

11

53.

Dawn has been advised that the Coastal Primary Policy has been exhausted; thus, the Coastal Excess Insurer is obligated to provide defense and indemnification.

54.

Pursuant to the Coastal Excess Policy, Coastal Excess Insurer agreed as follows:

> In consideration of the payment of the premium set out in Item 7 of the Declarations and in reliance upon the proposal for this policy (hereinafter Policy), statements made, and any supplementary information pertaining to the proposal which are all deemed incorporated herein, Underwriters agree, subject to the Insuring Agreements, Conditions, Exclusions, Definitions, and Declarations contained in this Policy, to indemnify the "Insured" in respect of its operations anywhere in the World, for "Ultimate Net Loss" by reason of liability . . . assumed by the "Insured" under an "Insured Contract."

(*See* Exhibit 2, Coastal Excess Policy, § I.1).

55.

Dawn is included in the definition of "Insured" in the Coastal Excess Policy. (*See id.*, § IV.13(d)).

56.

Alternatively, the Coastal Excess Policy contains the following Primary Additional Assured Endorsement:

> Insurers agree that, if required by written contract, any person, firm or organisation is included as an Additional Assured but only in respect of liability for Bodily Injury and/or Property Damage arising out of operations performed by the Named Assured and only to the extent required under said written contract.
>
> This insurance applies separately to each Assured against whom claim is made or suit is brought except with respect to Insurers' limits of liability.

> The inclusion of any person, firm or organisation as an Assured shall not affect any right which such person, form or organisation would have as a claimant if not included.

(*See id.* at 33).

57.

The Master Time Charter Agreement required that Dawn be included as an Additional Assured on Coastal's primary and excess P&I policies; thus, Dawn is an Additional Assured under the Coastal Excess Policy pursuant to the Primary Additional Assured Endorsement.

58.

Dawn is therefore entitled to defense and indemnification for the actions brought by REC and Bisso, because the defense and indemnification is required by a written contract and is in respect of liability for Bodily Injury arising out of operations performed by Coastal.

**Waiver by Primary P&I Underwriters**

59.

Dawn timely submitted notice of the alleged incident to Primary P&I Underwriters shortly after the incident occurred on July 18 or 19, 2014.

60.

To date, Primary P&I Underwriters has neither denied coverage nor reserved its right to deny coverage under the Primary P&I Policy

61.

Additionally, in 2016, Primary P&I Underwriters, through its agent Trident Marine Managers, Inc. ("Trident"), informed Dawn that Primary P&I Underwriters was opening a claim for the alleged incident.

62.

Primary P&I Underwriters has waived any coverage defenses to its defense and indemnification obligations under the Primary P&I Policy because, among other reasons and as a result of other conduct, of its failure to deny coverage or issue a reservation of rights upon receiving timely notice of a claim by Dawn and by communicating with Dawn that Primary P&I Underwriters was opening a claim for the alleged incident.

63.

Dawn has, to date, not received any affirmative denial of coverage from Primary P&I Underwriters or any reservation of rights letter. Dawn only became aware that Primary P&I Underwriters may be denying coverage because of the September 24, 2018 Answer filed by Primary P&I Underwriters to Bisso's Amended and Supplemental Complaint in this action.

**Waiver by and Estoppel against Coastal Excess Insurer**

64.

Trident also acted as Coastal Excess Insurer's agent in arranging for coverage under the Coastal Excess Policy.

65.

Trident has authority to act on behalf of Coastal Excess Insurer.

66.

On or about September 10, 2014, Trident confirmed that the Coastal Primary Insurer and the Coastal Excess Insurer agreed to endorse coverage for Dawn from the inception of the Coastal Excess Policy.

67.

On or about September 10, 2014, the June 13, 2014 Endorsement attached as Exhibit 3 was provided to Dawn to demonstrate that Dawn was an Additional Insured under the Coastal Primary Policy and the Coastal Excess Policy. Coastal Excess Insurer expressly acknowledged that Dawn was added as an insured under the Coastal Excess Policy.

68.

Additionally, on or about October 9, 2014, Trident expressly confirmed to Dawn that the Coastal Excess Insurer would defend and indemnify Bisso for the alleged incident that occurred on or about July 18 or 19, 2014.

69.

Notwithstanding these representations, Dawn was informed by Coastal Excess Insurer on May 31, 2018 that Coastal Excess Insurer was denying coverage for the alleged incident. This was the first notice that Dawn received that Coastal Excess Insurer was denying coverage.

## COUNT ONE:
## INDEMNIFICATION (against Primary P&I Underwriters)

70.

Dawn repeats and re-alleges the foregoing paragraphs as though set forth in full herein.

71.

As set forth above, Dawn contracted with Primary P&I Underwriters for a policy of insurance.

72.

Pursuant to the Primary P&I Policy, including the Contractual Cover Clause, Primary P&I Underwriters was and remains obligated to provide defense and, if any is due, indemnification to Dawn for the demands made by REC and Bisso.

73.

Therefore, Dawn is entitled to a defense from Primary P&I Underwriters and, to the extent Dawn is cast in judgment to REC and/or Bisso, indemnification from Primary P&I Underwriters.

## COUNT TWO:
## INDEMNIFICATION (against Coastal Excess Insurer)

74.

Dawn repeats and re-alleges the foregoing paragraphs as though set forth in full herein.

75.

As set forth above, Dawn has a contract with Coastal Excess Insurer for a policy of insurance.

76.

Pursuant to the Coastal Excess Policy, including through the definition in Section IV.13(d) and Primary Additional Assured Endorsement, Coastal Excess Insurer was and remains obligated to provide defense and, if any is due, indemnification to Dawn for the demands made by REC and Bisso.

77.

Therefore, Dawn is entitled to a defense from Coastal Excess Insurer and, to the extent Dawn is cast in judgment to REC and/or Bisso, indemnification from Coastal Excess Insurer.


**WHEREFORE**, Third-Party Plaintiff Dawn Services, LLC prays that these Third-Party Demands be deemed good and sufficient, that Certain Primary Protection and Indemnity Primary P&I Underwriters Subscribing Severally to Policy No. UMR: B0507 M13PP06940 and Certain Underwriters at Lloyd's, London Subscribing to Excess Protection & Indemnity Policy No.

UMR: B0507 M13PL03120 (Cover Note Number TMU-405906) be cited to appear and defend this suit, and that, after due proceedings are had, there be judgment in favor of Dawn Services, LLC and against Defendants as set forth herein. Dawn Services, LLC prays for any and all additional equitable and legal relief deemed just and appropriate by the Court.

Respectfully Submitted,

/s/ Loretta G. Mince
Loretta G. Mince, 25796
Michael R. Dodson, 37450
FISHMAN HAYGOOD, L.L.P.
201 St. Charles Avenue, 46th Floor
New Orleans, Louisiana 70170-4600
Telephone: (504) 586-5252
Facsimile: (504) 586-5250

*Attorneys for Dawn Services, LLC*

### CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of October, 2018, I electronically filed the foregoing pleading with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all CM/ECF participants.

/s/ Loretta G. Mince
LORETTA G. MINCE